UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
Joseph Hirsch, pro se,                         :

                      Petitioner,          :      **MEMORANDUM AND ORDER**

                  -against-             :      03-CV-1617 (DLI)

James J. Plescia, Superintendent,  :

                  Respondent.      :
--------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

      Joseph Hirsch ("Petitioner"), appearing pro se, petitions the court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his convictions, in the Supreme Court of Suffolk County, New York, on two counts of sexual abuse in the first degree, two counts of assault in the second degree, and unlawful imprisonment in the first degree, in violation of N.Y. PENAL LAW §§ 130.65, 120.05, and 135.10, respectively. After a jury trial in late 2001, where Petitioner was acquitted of five other charges, Petitioner was sentenced on January 3, 2002 to six years of imprisonment for his sexual abuse and assault convictions and one and a third to four years of imprisonment for his unlawful imprisonment conviction. These sentences were to be served concurrently. For the following reasons, the petition for a writ of habeas corpus is denied.

**Background**

      On January 14, 1999, Petitioner picked up Ms. Barbara Newell, whom he had arranged to meet through a personal ad, at her home for a date. Though they were supposed to go to a nearby diner, Ms. Newell claimed Petitioner lured her back to his home by saying he needed to make a

phone call. Ms. Newell testified she stayed in Petitioner's car at first, refusing to follow him inside, but eventually relented upon Petitioner's insistence. Though Ms. Newell told Petitioner several times she did not want anything to drink, Petitioner convinced her to try a "concoction" with soda and lemon. Ms. Newell testified the drink appeared cloudy, but she drank it upon Petitioner's urging. Ms. Newell then testified she felt dizzy and dropped in and out of consciousness as Petitioner physically and sexually abused her. She testified that Petitioner beat her whole body, including her face, chest, and stomach, pulled on her breasts and pubic hair, and kicked her in the coccyx area. Ms. Newell also testified she felt something hard being inserted in her rectum and vagina but did not know what it was. Ms. Newell stated the pain from these injuries lasted around one month.

Ms. Newell testified at trial that she did not remember how she returned home that evening. In a signed statement given earlier to police, which was read into the record at trial, Ms. Newell reported: "I don't remember what time we left [Petitioner's] house. I remember though that I was trying to find my underwear, pantyhose and dress. When he drove me back to my house, he said he would call me soon. I retired to my bedroom, fell asleep fully clothed. I woke up, did not wash and called the police." (Tr. at 388–89.) At trial, Ms. Newell testified she did not remember signing this statement. A medical report dated January 15, 1999 noted: "[Petitioner] then helped her to put her clothes on and took her home. She rang her door bell, went in, went to bed and woke up at 6:45 in the morning." (*Id*. at 397.) The court instructed the jury that these statements were offered as prior inconsistent statements to Ms. Newell's trial testimony.

Audley Newell, Ms. Newell's son, testified he was "about 10 or 11" in January 1999 when Petitioner arrived to take his mother to dinner. At some point late that night, Audley was awakened

2

by what he thought was the sound of a screeching tire. He saw his mother lying in the snow outside and ran to her. His mother was unresponsive and he notice her clothing was "ripped and . . . kind of inside out." (Tr. at 212.) He also noticed blood around his mother's eye and some on her clothing and arms. Audley and his sister, who was around thirteen years old at the time, dragged Ms. Newell inside the house and put her in bed. Audley testified his mother was mumbling but did not wake up.

At around 7:30 a.m. on January 15, 1999, Officer Anne Marie Renzulli-Migliore and her partner, Officer Dave Lewis, responded to a 911 call from Ms. Newell. Officer Renzulli-Migliore entered Ms. Newell's bedroom and described finding her "a mess. She was—she looked disheveled, very upset. Her eyes were all puffy." (Tr. at 57.) Officer Renzulli-Migliore testified she did not see Ms. Newell bleeding anywhere but that she had only seen her fully clothed. Ms. Newell was taken to the emergency room of Nassau University Medical Center.

Ms. Janet Thorne, a physician's assistant specialized in obstetrics and gynecology at the Nassau University Medical Center, examined Ms. Newell on January 15, 1999. Ms. Thorne conducted an external examination of her chest, abdomen, and pelvic areas and performed a rape kit examination. Ms. Thorne testified that Ms. Newell's abdomen, chest, and head were tender, that she had redness in her upper breast area, but that her external genitalia appeared normal. Ms. Thorne also noted that Ms. Newell had complained of rectal bleeding from attempted anal intercourse. Ms. Newell's eye was bruised, her left knee was swollen, and she had an open lesion with blood on her sacral area. An x-ray revealed Ms. Newell's coccyx was fractured. A diagram documenting Ms. Newell's injuries, drawn by Ms. Thorne on January 15, 1999, recorded only redness on the left breast. Ms. Newell told Ms. Thorne she had been given a cloudy drink and afterwards was staggering and not able to walk steadily. Carmeta Bancroft-Mayne, a registered nurse employed at

3

Nassau University Medical Center, also saw Ms. Newell on January 15, 1999. Nurse Bancroft-Mayne testified as to having seen the same bruising, contusions, and redness that Ms. Thorne observed. Several photographs of Ms. Newell's injuries, taken on January 15 and 18, 1999,[1] were admitted into evidence at trial. Ms. Newell testified she had been bleeding in many places and that there was blood all over her bedroom, but she did not point this out to police officers.

Detective Robert Bautz of the Suffolk County Police Department met with Ms. Newell while she was being treated at Nassau University Medical Center. Ms. Newell provided him with a phone number for "Joe," her attacker. Police traced the information to Petitioner's residence and, when police brought Ms. Newell to the area, she recognized Petitioner's house. Police arranged for a controlled telephone call to be made from Ms. Newell to Petitioner, wherein Ms. Newell identified Petitioner's voice. On January 21, 1999, Detective Bautz arrived at Petitioner's residence with a search warrant. Detective Bautz noticed a broken blind in Petitioner's bedroom.[2] Detective Sergeant Brian Traynor, Detective Bautz's supervisor, was also present for the search of Petitioner's home. When Detective Traynor told Petitioner the detectives had a search warrant for the premises because of a sexual assault allegation involving an incident "that took place . . . a week ago," Petitioner responded, "Oh, Barbara. . . . She was here last week. We had some wine, we're having sex and things got rough." (Tr. at 1029.) After he was arrested on January 21, 1999, Petitioner signed a sworn statement indicating, "Barbara told me her ex-husband . . . did it rough with her and I also like

---

[1] In the photographs taken on the 18th, Ms. Newell's injuries were more apparent. (Tr. at 101.)

[2] Ms. Newell testified that, while Petitioner was beating her, she "ran to a window" and heard Petitioner say, "Bitch, you broke my window." (Tr. at 294.) Petitioner interprets this testimony in his memorandum as Ms. Newell alleging "that she was trying to get away, and that she fell and hit her head on the windowsill, breaking his blinds." (Pet'r Mem. at 4–5 (citing Tr. at 294).)

4

it rough if the woman likes it rough." (Tr. at 572–73.) Petitioner stated that they did not engage in sexual intercourse but that he fondled her and "stopped when things didn't appear to be going well." (*Id*. at 573.) Petitioner's sworn statement was read into the record at trial during Defective Bautz's testimony.

During the search of Petitioner's home, Detective Bautz asked him whether he had any controlled substances in the house, and Petitioner directed the detectives to his dresser drawer, where they found a prescription vial for Ambien containing five tablets. Petitioner told Detective Bautz that Ms. Newell might have taken some of the pills while he was using the telephone. The bottle was not tested for fingerprints. Mr. Joseph Avella, a forensic scientist at the Suffolk County Medical Examiner's Office, confirmed that Ms. Newell's urine tested positive for Zolpidem. As Mr. Avella testified, this compound, which is known by the trade name "Ambien," is a "hypnotic" used to treat insomnia. Dr. Edward Briglia, chief toxicologist at the Suffolk County Medical Examiner's Office, testified that the effect of taking Ambien is "dizziness or what is known as vertigo, lethargy, drowsiness, ataxia or staggering, proceeding to a state of semi-consciousness and, finally, unconsciousness or sleep." (Tr. at 1069.) He also testified that the drug can sometimes produce short or long-term amnesia and can effect an individual's ability to physically resist sexual advances. According to Petitioner, Ms. Newell drank two glasses of wine while at his apartment, but no alcohol was detected in Ms. Newell's urine sample from the next day. Petitioner showed police an open bottle of sparkling wine in his refrigerator, but it was not tested for fingerprints.

During a search of Petitioner's home and vehicle, police officers did not find any traces of semen or blood. Ms. Diane Alia, a forensic scientist at the Suffolk County Crime Laboratory who analyzed the evidence collected during Ms. Newell's rape kit examination, testified that she did not

5

find any traces of semen or blood on Ms. Newell's clothing or from anal, vaginal, and oral swabs. Mr. Clyde Wells, also a forensic scientist at the same laboratory, testified he found a red carpet fiber in a tape lift of Ms. Newell's underpants that was consistent with the carpet in Petitioner's home. Several black dog hairs were recovered from Ms. Newell's clothing and similar hairs were found in a tape lift of Petitioner's bed sheets.

**Procedural History and Petitioner's Arguments**

Petitioner appealed his convictions, arguing *inter alia* that he was denied his right to a fair trial because the prosecutor engaged in misconduct, particularly during summation. On November 25, 2002, the Appellate Division, Second Department, affirmed Petitioner's convictions and held:

> The defendant's arguments regarding alleged prosecutorial misconduct during summation are largely unpreserved for appellate review. In any event, the remarks alleged to be inflammatory and prejudicial constituted fair comment on the evidence, were responsive to the arguments presented in the defense counsel's summation, or were harmless under the circumstances. Moreover, the trial court acted promptly to cure any prejudicial effect that may have resulted.

*People v. Hirsch*, 299 A.D.2d 559, 559 (2d Dep't 2002) (citations omitted). The Appellate Division also held that there was "legally sufficient [evidence] to establish the defendant's guilt beyond a reasonable doubt." *Id.* On March 4, 2003, the New York Court of Appeals denied Petitioner leave to appeal. *People v. Hirsch*, 99 N.Y.2d 629 (2003). Petitioner did not seek certiorari review before the United States Supreme Court or file any other post-conviction motions.

On April 1, 2003, Petitioner timely filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, arguing that he was denied his right to a fair trial due to prosecutorial misconduct. In particular, Petitioner asserts that the prosecutor made several inflammatory and prejudicial

remarks in summation, including descriptions of Petitioner as "sadistic" (Tr. at 1204, 1228), an "animal" (*Id*. at 1249), "Mr. Hocus-Pocus" (*Id*. at 1220), "sneaky and conniving" (*Id*. at 1222), "as calculating as they come" (*Id*. at 1223), and of his defense as "absurd," "ridiculous," "insulting and offensive" (*Id*. at 1248), and "offensive, lies, and misleading." (Pet'r Mem. at 22–23.) Petitioner further claims the prosecutor characterized his written statement as "lies" (Tr. at 1225), accused defense counsel of "distorting the facts" and "misleading" the jury (*Id*. at 1214), made inappropriate comments about defense counsel's fees (*Id*. at 1216), and argued repeatedly that Petitioner's story was not "innocent" or "normal." (Pet'r Mem. at 22–23.) Petitioner's remaining complaint relates to the prosecutor accusing defense counsel of "lawyering" when he cross-examined Ms. Newell. (Tr. at 1204.) Petitioner also claims, in a three-page summary attached to his petition, that "[t]he prosecutor's summation, her violations of the evidentiary rules set down in *People v. Molineux*, 168 N.Y. 264 (1901), *People v. Rosario*, 9 N.Y.2d 286 (1961), *cert. denied*, 368 U.S. 866 (1962), and Criminal Procedure Law § 710.30, all contributed to the overall unfairness of the trial and amounted to a due process violation."

The District Attorney of Suffolk County, attorney for Respondent, opposes the petition, arguing that the prosecutor's comments were either unpreserved for appellate review by the state court, within the bounds of fair comment, cured by court instruction, or non-prejudicial. (Resp't Mem. at 13–16, 19–20.) Respondent argues that "most of the statements made by the prosecutor were not objected to by petitioner. Any complaints as to these comments . . . were not preserved for appellate review as a matter of law by specific and contemporaneous objection." (Resp't Mem. at 16.) Respondent discusses the merits of only the comments to which Petitioner did object at trial.

7

While it is true that, under New York law, a defendant must object to an issue in order to preserve it for appellate review, N.Y. CRIM. PROC. LAW § 470.05(2), "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar," *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989). Such is not the case here, where the Appellate Division stated that the prosecutorial misconduct claims were "*largely* unpreserved." *See Garcia v. Greiner*, 2004 WL 943902, at *3 n.2 (E.D.N.Y.) (noting that the phrase "largely unpreserved" does not mean "completely" unpreserved and, thus, does not preclude habeas review); *McCaskell v. Keane*, 2001 WL 840331, at *14 (S.D.N.Y.) (concluding that the use of "largely unpreserved" by the Appellate Division was "equivocal" and, thus, did not present an adequate and independent state ground that would bar habeas review). Although Petitioner's counsel did not object to most of the comments alleged to have constituted misconduct, he did object a few times during the prosecutor's summation, namely (1) when the prosecutor said that the defendant's conduct "was offensive," (2) when the prosecutor accused defense counsel, Mr. Keahon, of misleading the jury, and (3) when the prosecutor commented on Petitioner's financial situation: "If Mr. Keahon is representing him, he can afford to take [Ms. Newell] out for dinner." (Tr. at 1215–16, 1250, 1253.)[3] The trial court sustained all of these objections but did not give any curative instructions beyond telling the jury to disregard the statements. The court later instructed the jurors that they were to rely upon their own recollection of the evidence rather than arguments given during

---

[3] Petitioner also claims his counsel objected to the prosecutor labeling Petitioner as "sneaking and conniving," but the trial transcript shows that the prosecutor was quoting one of the witnesses, Detective Sergeant Traynor, and counsel objected to the fact that this testimony was stricken from the record. (Tr. at 1222.)

summations. Following the prosecutor's summation, defense counsel repeated the inappropriateness of some of the prosecutor's comments and moved for a mistrial, and the court denied the motion. (*Id*. at 1262.) Because the procedural bar is inapplicable in this case, the court must therefore proceed to the merits of Petitioner's claims.

**Applicable Law**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), where claims in state court were "adjudicated on the merits," the federal district court may grant a petition for a writ of habeas corpus only upon a finding that the state court proceeding "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In *Williams v. Taylor*, the Supreme Court held that a state court decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." 529 U.S. 362, 412–13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). The Court in *Williams* further held that the "unreasonable application" clause warrants federal habeas relief "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The Second Circuit has remarked:

> As an abstract proposition, we can only echo Justice O'Connor's virtually

> tautological statement that to permit habeas relief under the "unreasonable application" phrase, a state court decision must be not only erroneous but also unreasonable. Some increment of incorrectness beyond error is required. We caution, however, that the increment need not be great; otherwise, habeas relief would be limited to state court decisions "so far off the mark as to suggest judicial incompetence."

*Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000). In reviewing the state court decision, "a determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The appropriate standard of review for a habeas corpus petition involving prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (citing *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)). The petitioner must show the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). Only comments by a prosecutor that constitute "egregious misconduct . . . amount[ing] to a denial of constitutional due process" are sufficient for showing prosecutorial misconduct. *Floyd*, 907 F.2d at 353 (citing *Donnelly*, 416 U.S. at 647–48).

Standing alone, inappropriate prosecutorial comments are insufficient to overturn a conviction. *Duran*, 322 F. Supp. 2d at 259 (citing *United States v. Young*, 470 U.S. 1, 11, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)). Indeed, "remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability

to judge the evidence fairly." *Young*, 470 U.S. at 12. Assessing the impact of prosecutorial misconduct includes analyzing the severity of the comments and whether the trial court took any curative measures. *See U.S. v. Melendez*, 57 F.3d 238, 241 (2d Cir. 1995).

While it is well-settled that federal habeas relief is only available for prejudicial errors, the Supreme Court has pronounced two different harmless error tests. *See Brown v. Keane*, 355 F.3d 82, 91 (2d Cir. 2004). Under *Brecht v. Abrahamson,* the test is "whether the error had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). The Court in *Chapman v. California*, on the other hand, set forth a standard of "harmless beyond a reasonable doubt." 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Post-AEDPA, the Second Circuit has not yet decided whether the appropriate harmless error standard is the *Brecht* test or "whether the state court's decision was 'contrary to, or involved an unreasonable application of' *Chapman*." *Brown*, 355 F.3d at 91 (quoting *Noble v. Kelly*, 246 F.3d 93, 101 n.5 (2d Cir. 2001)).

**Analysis**

Some of the prosecutor's comments were clearly improper, such as calling Petitioner "sadistic" or "an animal," but the court does not find that, as a whole, Petitioner was deprived of a fair trial. Several comments of which Petitioner complains do not rise to a level that would warrant habeas relief. For example, the accusation that Petitioner had lied in the sworn statement he gave to police commented on the credibility of Petitioner's version of events, which was at issue given the contradicting testimony from other witnesses. The Second Circuit has noted that negative comments regarding a witness's credibility are only improper where the "use is excessive or is likely

11

to be inflammatory." *United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002) (quoting *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987) (noting that convictions have been upheld where prosecutor used "liar" or "lie" to describe witnesses or their testimony). In *Coriaty*, the Second Circuit affirmed the denial of a habeas petition where the prosecutor had described expert witness testimony as "garbage in, garbage out" and "built on a foundation of sand." *Id*. Also, comments made by the prosecutor that defense counsel was misleading the jury or distorting the facts were not overly inappropriate, considering that the prosecutor was responding to similar comments from defense counsel. *See United States v. Clark*, 613 F.2d 391, 405 (2d Cir. 1979) ("Where a substantial portion of the defense summation is devoted to attacks upon government witnesses . . . the prosecutor is entitled to make an appropriate response.") Indeed, during his summation, defense counsel attacked the credibility of all witnesses and, at one point, told jurors that the testimony of prosecution witnesses "was not logical, did not meet with your common sense and with experiences you've had in your lives." (Tr. at 1113.)

The trial court's instruction to jurors that summations were not evidence and should not be used in reaching their decision also lessens the blow of the prosecutor's comments. *See Darden*, 477 U.S. at 182. Finally, though there was some inconsistent testimony regarding the injuries Ms. Newell sustained and the timeline of the events of January 14, 1999, substantial evidence supported Petitioner's conviction. Petitioner made incriminating statements to the police, including admitting to having "rough" sexual contact with the victim, and physical evidence, such as the carpet fibers found in Ms. Newell's underpants, the Ambien found in her system, and the broken blind in Petitioner's home, corroborated Ms. Newell's testimony. Thus, the prosecutor's comments would not "have tipped the scales in favor of the prosecution." *See Duran*, 322 F. Supp. 2d at 259 (quoting

*Fero v. Kerby*, 39 F.3d 1462, 1474 (10th Cir. 1994)). Examining the alleged inappropriate remarks in the context of the trial, under either the *Brecht* or the *Chapman* standards, Petitioner has failed to show prejudice. His claim for prosecutorial misconduct fails.

As to Petitioner's claims that the prosecutor violated New York State evidentiary rules under *Molineux* and *Rosario* and pursuant to N.Y. CRIM. PROC. LAW § 710.30, these claims do not raise a federal constitutional issue that warrants habeas relief. "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990)); *see also Southerland v. Gourd*, 269 F. Supp. 2d 48, 52–53 (E.D.N.Y. 2003). Indeed, federal courts are limited to determining whether state court evidentiary rulings violated "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *see Estelle*, 502 U.S. at 68.

Petitioner protests the trial court's alleged admission, in violation of *Molineux*, of testimony that he had touched the buttocks of Ms. Newell's daughter on the evening of January 14, 1999. However, this testimony was stricken from the record upon defense counsel's objection and jurors were told not to consider it for any purpose. Though Petitioner claims he did not have notice of his alleged statement to police that he and Ms. Newell had engaged in "rough" sex, included in *Rosario* material turned over to defense counsel were handwritten notes from either Detective Bautz or Detective Sergeant Traynor, indicating that Petitioner had stated he and Ms. Newell "were a little rough." There is no basis to conclude that these alleged evidentiary errors would have affected the trial result, and habeas relief is thus unwarranted. *See Southerland*, 269 F. Supp. 2d at 52–53.

**Conclusion**

The petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied. Petitioner further is denied a certificate of appealability as he fails to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see* FED. R. APP. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); *Luciadore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).

SO ORDERED.

DATED:    Brooklyn, New York
          August 23, 2005

_____/s/_____
DORA L. IRIZARRY
United States District Judge